UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROBERTO FRANCISCO FRANCO
RODRIGUEZ,

        Petitioner,

    v.

                                Case No. 2:26-cv-2-KCD-DNF

ACTING DIRECTOR U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, MIAMI FIELD
OFFICE; SECRETARY U.S.
DEPARTMENT OF HOMELAND
SECURITY, ACTING ATTORNEY
GENERAL, DIRECTOR U.S.
IMMIGRATIONS AND CUSTOMS
ENFORCEMENT, SENIOR
OFFICIAL PERFORMING THE
DUTIES OF; AND WARDEN,
FLORIDA SOFT SIDE SOUTH
DETENTION CENTER,

        Respondents.

_____/

## **ORDER**

Petitioner Roberto Francisco Franco Rodriguez is a Cuban national who arrived in the United States in 1980 as part of the Mariel boatlift. Five years later, he became a lawful permanent resident. (Doc. 1-2.)[1] But that status came to an end after Rodriguez was convicted of selling methamphetamine. (Doc. 1-

_____

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

3.) An immigration judge then ordered him removed from the country. (Doc. 1-4.) Because the Government could not effectuate his return to Cuba due to diplomatic barriers, U.S. Immigration and Customs Enforcement ("ICE") released him on an order of supervision. (Doc. 1-5.)

For over twenty years, Franco Rodriguez lived in the community and apparently complied with his conditions of release. (Doc. 1 at 8.) But then, on November 2, 2025, ICE abruptly revoked his supervision and detained him. ICE cited a significant likelihood of removal in the reasonably foreseeable future. (Doc. 14-1.) The Government points out that the Cuban government recently approved his repatriation, and ICE has allocated him a seat on a removal flight scheduled for March 2026. (Doc. 14-2 at 2.) This lawsuit seeking a writ of habeas corpus followed.

Rodriguez is challenging the legality of his continued immigration detention. He mounts a multi-pronged attack. First, he argues that the Government violated the Fifth Amendment's Due Process Clause by revoking his liberty without prior notice, an explanation, or a meaningful opportunity to be heard. (Doc. 1 at 24-26.) Second, he invokes the *Accardi* doctrine, contending that his detention is unlawful because ICE completely ignored its own binding regulations governing the revocation of release for Mariel Cubans. (*Id.* at 27.) Finally, he asserts that his detention violates the Immigration and Nationality Act ("INA") because the state-run facility holding him lacks the

2

proper statutory authority and federal contracts to operate as an immigration detention center. (*Id.* at 27-28.)

The Government meets the petition with two arguments. First, it asserts that the INA strips this Court of subject-matter jurisdiction. (Doc. 14 at 4-7.) Second, on the merits, the Government contends the detention is legally sound because Rodriguez is subject to a final removal order, his removal is significantly likely, and ICE complied with its regulatory obligations. (*Id.* at 7-12.)

The Court is satisfied it has jurisdiction. But on the merits, Rodriguez has shown he was denied due process. Accordingly, the petition is **GRANTED IN PART AND DENIED IN PART**.

## I. Legal Standard

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or law or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

## II. Discussion

A court cannot grant habeas relief if it lacks the statutory power to entertain the petition in the first place. The Government first argues that subject-matter jurisdiction is absent here. (Doc. 14 at 4-6.) Specifically, it relies on 8 U.S.C. §§ 1252(g) and 1252(b)(9)—provisions designed to strip district courts of jurisdiction over claims arising from the execution of removal orders. In the Government's view, because Rodriguez was detained to carry out his final removal order, his habeas petition is merely an impermissible attempt to challenge that ongoing legal process. The Court addresses each of these jurisdictional statutes in turn.

### 8 U.S.C. § 1252(g)

Section 1252(g) says that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." *Id.* This provision specifically limits "habeas corpus jurisdiction, including under § 2241." *Islas v. DHS/ICE Off. of Chief Couns. - ATD*, No. CV 323-002, 2023 WL 2761710, at *1 (S.D. Ga. Jan. 23, 2023); *see also Wallace v. Sec'y, U.S. Dep't of Homeland Sec.*, 616 F. App'x 958, 961 (11th Cir. 2015).

But § 1252(g) does not cover "all deportation-related claims." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 478 (1999). It has a far

4

narrower reach. It forecloses judicial review of three discrete actions by the Attorney General: her "decision or action to commence proceedings, adjudicate cases, or execute removal orders." *Id.* at 482. As the Supreme Court recently reiterated, § 1252(g) does not "sweep in any claim that can technically be said to arise from the three listed actions." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018). Instead, it "refer[s] to just those three specific actions themselves." *Id.*

Rodriguez's petition steers clear of those forbidden actions. He is not asking this Court to vacate his removal order or to stop the Government from putting him on a plane. Instead, he is challenging the procedural mechanics of his current detention. His argument is that the Government failed to follow its own rulebook when it revoked his release. (*See* Doc. 18 at 6.) Specifically, ICE skipped the procedural safeguards—the advance notice, the meaningful interview, and the required review panel—that are required before stripping a Mariel Cuban of his conditional liberty. (*Id.*) A claim that the Government locked someone up in violation of binding regulations is a challenge to the process of detention, not a challenge to the commencement or execution of a removal order. *See, e.g., Navarro v. Bondi*, No. 8:25-CV-3213-KKM-NHA, 2025 WL 3275944, at *2 (M.D. Fla. Nov. 25, 2025).

The core of this case is not about the Attorney General's decision to detain Gomez-Alcina. It's about whether the Government followed its own regulations in that process. (*See* Doc. 1.) Such a claim is best understood as

independent of, and collateral to, removal because it may be resolved without affecting the Attorney General's prosecutorial discretion that § 1252(g) was meant to preserve. *See Reno*, 525 U.S. at 485 n.9 ("Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."); *see also Arroyo v. Diaz*, No. 25-62676-CIV, 2026 WL 279656, at *4 (S.D. Fla. Feb. 2, 2026); *Banega v. Noem*, No. 2:25-CV-1152-JES-DNF, 2026 WL 234042, at *2 (M.D. Fla. Jan. 29, 2026).

One last point. If the Government's reading were correct, § 1252(g) would act as a jurisdictional black hole for anyone held in immigration custody. Under its theory, so long as the executive branch points to a final removal order, it could hold a noncitizen indefinitely, ignore its own regulations, or subject the detainee to unconstitutional conditions, all while insisting that federal courts are powerless to intervene. The Supreme Court has never read § 1252(g) so broadly. *See also Arroyo*, 2026 WL 279656, at *4, *Banega*, 2026 WL 234042, at *2.

### 8 U.S.C. § 1252(b)(9)

Next up is the so-called "zipper clause," which "bars review of claims arising from 'action[s]' or 'proceeding[s]' brought to remove an alien.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting 8 U.S.C. § 1252(b)(9)). This discussion can be short. The Eleventh Circuit has held "that the zipper clause only affects cases that involve[] review of an order of

removal." *Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020). Rodriguez is not challenging his removal proceedings. So "the Government's reliance on § 1252(b)(9) is misplaced." *Fernandez-Garcia v. U.S. Att'y Gen.*, No. 1-20-CV-23599-UU, 2021 WL 8821923, at *5 (S.D. Fla. Apr. 15, 2021).

With the Court satisfied of its jurisdiction, we now turn to the merits. Rodriguez's claims are addressed in turn.

### Count I—Substantive Due Process

A noncitizen subject to a final order of removal, like Rodriguez, has no inherent right to walk free while awaiting deportation. *See* 8 U.S.C. § 1231. "Detention during deportation proceedings," the Supreme Court has explained, is simply "a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). But there is a catch. Holding an admitted alien indefinitely is also a constitutional non-starter since "the Due Process Clause applies to all persons within the United States." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

To reconcile these points, the Supreme Court in *Zadvydas* capped "an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *Id.* at 689. And to give lower courts a workable yardstick, the Court drew a line at six months: any post-removal detention lasting six months or less is "presumptively

7

reasonable." *Id.* To have a substantive due process claim in this context, then, "the alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002).

Apply that framework here, and Rodriguez's claim immediately runs into a math problem: he has not been detained long enough. ICE grabbed him on November 2, 2025. Because he has been in custody just over four months, he remains squarely within the window in which his detention is presumptively reasonable. *See Guerra-Castro v. Parra*, No. 1:25-CV-22487, 2025 WL 1984300, at *4 (S.D. Fla. July 17, 2025) (finding habeas petition "premature" because "Petitioner has not been detained for more than six months"); *see also Jiang v. Mukasey*, No. 208-CV-773-FTM-29DNF, 2009 WL 260378, at *2 (M.D. Fla. Feb. 3, 2009); *Noel v. Glades Cnty. Sheriff*, No. 2:11-CV-698-FTM-29, 2011 WL 6412425, at *2 (M.D. Fla. Dec. 21, 2011).

To keep his claim alive, Rodriguez proposes a different way to run the clock. He argues that the six-month presumptively reasonable period is tethered to the beginning of the statutory removal period, not to the time he actually spends in physical custody. His theory goes like this: the six-month timer starts ticking the moment a removal becomes final, regardless of whether the noncitizen is sitting in a detention center or living freely in the

community. And because his removal order became final back in 2002, the six-month window slammed shut more than two decades ago. (Doc. 15-2.) Thus, his due process claim is perfectly ripe for review.

This argument makes little sense. *Zadvydas* was aimed at the severe, physical deprivation of liberty that comes from sitting in a jail cell indefinitely. The Court "used the words 'detain' and 'custody' to refer exclusively to physical confinement and restraint." *Jennings*, 583 U.S. at 311. Against that backdrop, it is illogical to run a clock designed to prevent indefinite imprisonment while a person is out living freely in the community. "Because *Zadvydas* clearly involved *detention* of a petitioner during the presumptively reasonable period, it defies common sense to suggest that *Zadvydas* time can run while a petitioner is not in custody." *Cheng Ke Chen v. Holder*, 783 F. Supp. 2d 1183, 1192 (N.D. Ala. 2011). The six-month clock measures actual lockup, not supervised freedom. *See Akinwale*, 287 F.3d at 1052 ("[I]n order to state a claim under *Zadvydas* the alien … must show post-removal order *detention* in excess of six months [and] also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." (emphasis added).)

When the Government holds a noncitizen for only a few months to execute a valid removal order, it is not doling out an unconstitutional penalty. It is simply doing what the regulatory scheme authorizes. Because his brief

9

confinement remains firmly tethered to a legitimate, civil immigration purpose, Rodriguez's substantive due process claim fails. *See H.N. v. Warden, Stewart Det. Ctr.*, No. 7:21-CV-59-HL-MSH, 2021 WL 4203232, at \*3 (M.D. Ga. Sept. 15, 2021); *Gudino v. Lowe*, No. 1:25-CV-00571, 2026 WL 526366, at \*8 (M.D. Pa. Feb. 25, 2026) ("[T]he length of detention is generally not unreasonable until the noncitizen has been detained for more than six months.").

### Count II—Procedural Due Process

The Fifth Amendment prohibits deprivation of an individual's life, liberty, or property without due process of law. U.S. Const. amend. V. "[T]he Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. Courts examine procedural due process claims in two steps: the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

We can make quick work of the first step. The Court is satisfied that Rodriguez enjoyed a protected right to remain free from physical custody. Once ICE unlocked the doors and placed him on supervised release, he acquired a

10

conditional liberty interest that triggered constitutional protection before it could be taken away. *See Young v. Harper*, 520 U.S. 143, 147-48 (1997). This is true even when the released individual is subject to extensive conditions of release. *See Rodriguez Romero v. Ladwig*, No. CV 25-1106-JWD-EWD, 2026 WL 321437, at *11 (M.D. La. Feb. 6, 2026) ("[N]on-citizens have an overwhelming liberty interest in their continued release under [an] Order of Supervision . . . that may not be removed without due process."); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [Due Process] Clause protects.").

That takes us to the second step: determining exactly what process is due. At its core, the Due Process Clause demands that before the government strips a person of a protected liberty interest, it must provide notice and a meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010).

From the record now before the Court, the opportunity to be heard is entirely missing. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (describing the opportunity to present reasons why proposed action

11

should not be taken as a "fundamental due process requirement"). Rodriguez showed up for a routine check-in and was promptly handcuffed, without a chance to challenge the agency's rationale for upending his life. The Government's response is telling in its silence. It points to no hearing, no informal interview, and no immediate forum where Rodriguez could contest his sudden re-detention. Instead, it relies on its "broad discretion" and gestures vaguely toward a paper file review expected to occur roughly three months down the line. (Doc. 14 at 9.) That is not how due process works. A belated review months after the jail cell door slams shut is cold comfort. Even ICE's own rulebook recognizes that taking away a person's conditional liberty—especially after decades of compliance—requires far more procedural rigor than a silent, unilateral fiat. *See, e.g.*, 8 C.F.R. §§ 241.4(l), 241.13(i).

Due process is flexible. It "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). To be sure, Rodriguez is a noncitizen subject to a final removal order, meaning he does not possess the full panoply of rights enjoyed by a citizen. But even with that caveat, the Constitution demands more than what has been offered here. The Government notes that a post-deprivation file review "will ordinarily be expected to occur within approximately three months after parole is revoked." (Doc. 14 at 9.) The Court cannot agree that is sufficient. Taking away a person's liberty and then making him sit in a detention center for a quarter

12

of a year before even glancing at his paperwork flips the constitutional baseline on its head. As other courts have recognized, a belated review, held more than three months after the jail cell door slams shut, is simply too little, too late to protect the core liberty interest at stake. *See Grigorian*, 2025 WL 2604573, at *9; *see also United States v. Smith*, 30 F.4th 1334, 1338 (11th Cir. 2022) ("We have said that the complete denial of the opportunity to be heard on a material issue is a violation of due process which is never harmless error[.]").

Rodriguez has proven a constitutional violation—the government cut corners and denied him the process he was due. But winning on a procedural claim is one thing; getting the remedy he wants is another.

Rodriguez seeks immediate release from custody. (Doc. 18 at 7.) That is a bridge too far. Habeas corpus is, at its core, governed by equitable principles. *Munaf v. Geren*, 553 U.S. 674, 693 (2008). And equity counsels against the drastic remedy of immediate release here for a couple of reasons. *Id.* ("The question, therefore, even where a habeas court has the power to issue the writ, is whether this be a case in which [that power] ought to be exercised.").

For one thing, a procedural foul usually calls for a procedural fix. When the government deprives someone of liberty without an adequate hearing, the standard judicial remedy is to order the government to hold that hearing, not to simply unlock the jailhouse doors. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). Ordering Rodriguez's outright release

13

would give him a substantive windfall for a procedural error. *See, e.g.*, *Msezane v. Gartland*, No. 5:19-CV-51, 2020 WL 1042293, at \*7 (S.D. Ga. Jan. 29, 2020) ("[P]rocedural due process does not require automatic release of a criminal alien once the detention is unreasonably prolonged but, instead, requires the government to afford the alien an individualized bond inquiry.").

But there is an even bigger reason for the Court's hesitation: timing. After more than two decades of diplomatic roadblocks, the Government's efforts to deport Rodriguez are finally crossing the finish line. The Cuban government has approved his repatriation, and ICE has secured him a seat on a removal flight scheduled for this very month. Intervening to order his outright release now would scramble a removal process that has been long in the making. The Constitution requires that Rodriguez get a meaningful opportunity to be heard. It does not require the Court to upend an imminent, long-awaited deportation just as the plane is preparing for takeoff. The proper course is to require the Government to do what it should have done in the first place: give him a meaningful opportunity to be heard as required under 8 C.F.R. § 241.13(i).[2] The Government must provide this process by April 3, 2026, if Rodriguez is not deported.

---

[2] Both parties seem to assume that 8 C.F.R. § 212.12 provides the rules for Rodriguez's release and re-detention. (Doc. 14 at 10, Doc. 18 at 5.) They reach that conclusion simply because he arrived in the United States on the Mariel boatlift. But that is wrong. Section 212.12 is a specialized provision governing parole and release procedures for Mariel Cubans. *See Marquez-Coromina v. Hollingsworth*, 692 F. Supp. 2d 565, 571 (D. Md. 2010). Rodriguez does

14

**Count III—Accardi Doctrine**

Rodriguez does not rely on the Constitution alone. He also brings a claim under the *Accardi* doctrine. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The premise of that doctrine is straightforward: "an agency must abide by its own regulations." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979). "[A]gency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the court." *Jean v. Nelson*, 727 F.2d 957, 976 (11th Cir. 1984). And it "goes without saying that ICE, like all government agencies, must follow its own regulations." *Roble v. Bondi*, 803 F. Supp. 3d 766, 774 (D. Minn. 2025).

As explained above, 8 C.F.R. § 241.13 governs here. It provides the precise steps ICE must take before re-arresting someone based on a renewed likelihood of removal. *Id.* § 241.13(i). But Rodriguez argues that ICE ignored those mandatory procedures entirely. He allegedly received "no written explanation, no finding of violation, and no procedural steps whatsoever before cancelling his supervision and taking him into custody." (Doc. 1 at 26.). Under

---

not fit that bill. Though he arrived in the 1980 boatlift, he eventually crossed the legal threshold to become a lawful permanent resident. That milestone pulled him completely out of § 212.12's orbit. Instead, when his lawful status was later revoked and ICE released him on an order of supervision because it could not effectuate his return to Cuba, he landed squarely in the territory of 8 C.F.R. § 241.13. That is the regulation designed specifically for noncitizens who are released after the government determines there is no significant likelihood of removal in the reasonably foreseeable future—and it is the rulebook that applies here. *See Choy v. Woosley*, No. 4:25-CV-197-DJH, 2026 WL 324601, at *3 (W.D. Ky. Feb. 6, 2026).

*Accardi*, he concludes, that complete regulatory bypass renders his ongoing detention legally defective and unlawful.

Rodriguez's contention that he received no written notice is a nonstarter. His own petition tells a different story. He admits that when officers took him into custody, they handed him a "Notice of Revocation of Release." (Doc. 1 at 8.) And he concedes that this piece of paper told him exactly why he was losing his liberty: ICE had determined there was a significant likelihood of his removal in the reasonably foreseeable future. (*Id.*) That is a written explanation. It may not have been the extensive memorandum Rodriguez would have preferred, but it was more than enough to put him on notice of the Government's basic rationale for bringing him back into custody. Nothing more was needed to satisfy § 241.13(i). *See Tran v. Warden, S. Side Det. Ctr.*, No. 2:25-CV-1224-KCD-NPM, 2026 WL 672969, at *8-9 (M.D. Fla. Mar. 10, 2026).

A quick detour. Rodriguez points out that the notice revoking his supervised release cites 8 C.F.R. § 241.4, which does not apply here. (Doc. 18 at 5.) But that misnomer does not entitle him to relief. The substance of the notice Rodriguez received did exactly what § 241.13(i) requires: it informed him that his supervision was ending so the Government could execute his removal order. The agency's core rationale has not changed between the time ICE handed him the paper and the time the Government filed its brief; only the citation did. Slapping the wrong alphanumeric label on the paperwork does

16

not erase the fact that the agency's actual, articulated reasoning was perfectly sound under the correct regulatory framework. In administrative law, we care about the contents of the box, not just the sticker on the outside. *See Tran*, 2026 WL 672969, at *9.

Turning next to Rodriguez's claim that the notice had "no finding of [a] violation," that argument misses the mark for a different reason. (Doc. 1 at 26.) He seemingly insists that ICE could not revoke his supervision because he never broke the rules. That may be true, but it is legally beside the point. The applicable regulation simply does not require a rulebook infraction to haul someone back into custody. Under 8 C.F.R. § 241.13(i)(2), the government can revoke release based on changed circumstances alone—specifically, when there is a "significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* Playing by the rules is commendable, but it does not buy a noncitizen permanent immunity from a final, executable deportation order.

Finally, Rodriguez complains that the Government took "no procedural steps whatsoever before cancelling his supervision and taking him into custody." (Doc. 1 at 26.) If he means ICE was required to provide process *before* putting him in handcuffs, he is misreading the rulebook. Section 241.13(i) does not mandate a pre-deprivation process. It allows the agency to revoke a release order and detain an individual based on changed circumstances without first

17

convening a panel or holding a hearing. *See* 8 C.F.R. § 241.13(i)(3) ("The Service will conduct an initial informal interview promptly *after* his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." (emphasis added).)

But if he means the Government completely dropped the procedural ball on the back end, he has a point. Section 241.13 requires a specific procedural safeguard once a noncitizen is returned to custody: an "informal interview." 8 C.F.R. § 241.13(i)(3). That interview is designed to give the individual a meaningful chance to respond to the agency's reasons for revoking his conditional liberty. *See Kem v. Noem*, No. 3:25CV997 DRL-SJF, 2026 WL 100566, at *4 (N.D. Ind. Jan. 14, 2026). And as already established, the Government skipped that step entirely—a clear regulatory violation. *See Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *9 (S.D. Fla. Sept. 9, 2025).

That violation, however, leads to the same remedial dead-end as Rodriguez's constitutional due process claim. When an agency fails to hold a required interview under its own regulations, the usual judicial response is to order the interview—not to hand the petitioner a get-out-of-jail-free card. *See, e.g.*, *Msezane v. Gartland*, No. 5:19-CV-51, 2020 WL 1042293, at *7 (S.D. Ga. Jan. 29, 2020). A procedural foul typically calls for a procedural fix. And for the same equitable and practical reasons already discussed, the Court will not

order Rodriguez's immediate release. Instead, the Government must do exactly what its regulations demand: provide the interview he is due.

### Counts IV & V—No Authority to Detain

In his final claims, Rodriguez shifts focus from the process of his detention to the place of his detention. He takes aim at the facility where he was housed—Alligator Alcatraz—arguing that it operates outside the bounds of the law. (Doc. 1 at 27-28.)

These claims can be disposed of quickly, starting with a glaring threshold problem: they appear moot. Rodriguez is seeking release from ICE custody based on the conditions at Alligator Alcatraz. The problem? He has already been released from *that* facility. The Government recently transferred him to a different detention center altogether. (Doc. 14 at 3.) Because Article III limits federal courts to resolving live disputes, that physical transfer effectively ends the legal conversation about his prior housing. Rodriguez cannot win release from a facility that no longer holds him, and he cannot use the conditions of a bygone facility as a master key to unlock the doors at his current one.

But even looking past the mootness hurdle, Rodriguez would still fall short. Suppose he is exactly right, and Alligator Alcatraz was operating in clear violation of the law. That fact would not entitle him to the relief he wants— release from ICE custody. A challenge to the conditions of confinement does not suddenly invalidate the legal basis for that confinement. If a detention

center is sub-par or operated unlawfully, the proper judicial remedy is to order the government to fix the facility or to transfer the detainee to one that passes muster. And as it turns out, the Government has already moved him. The Court declines to use a facility defect as an excuse to simply unlock the gates and let an individual with a final, executable removal order walk free.

**\* \* \* \***

In the final pages of his petition, Rodriguez tacks on two more requests for relief that seem to come out of nowhere. First, he asks for notice and a hearing to oppose removal to an "alternative third country," just in case the Government identifies one. (Doc. 1 at 28.) Second, he asks for a sweeping injunction to stop the Government from re-arresting him in the future, absent strict compliance with federal law. (*Id.*)

Neither request gets off the ground. To begin with, they are seemingly untethered from the petition itself. A prayer for relief is not a place to smuggle in standalone demands, and neither of these requests appears tied to an actual, substantive claim argued in his briefing. For instance, Rodriguez does not allege that he was denied an opportunity to contest his removal to a third country.

More fundamentally, both requests deal in pure hypotheticals. They ask the Court to solve problems that do not actually exist. "Federal courts cannot adjudicate . . . abstract disputes, or exercise general legal oversight of the

20

Legislative and Executive Branches." *Coker v. Austin*, 688 F. Supp. 3d 1116, 1121 (N.D. Fla. 2023). The Government's imminent plan is to send Rodriguez to Cuba, not some unknown third country. And he is currently sitting in custody, not living freely in the community bracing for a future, legally deficient re-arrest. Because these requests ask the Court to shadowbox with hypotheticals, they warrant no relief.

### III. Conclusion

The Government violated both the Constitution and the *Accardi* doctrine when it canceled Rodriguez's supervision without a chance to be heard. But winning on procedure does not entitle him to the substantive windfall of immediate release. Rather, the appropriate remedy is to require the Government to do its job and provide the process due. Accordingly:

1. Rodriguez's Petition for Writ of Habeas Corpus (Doc. 1) is **GRANTED IN PART** and **DENIED IN PART**.

2. To the extent Rodriguez seeks immediate release from ICE custody, the petition is **DENIED**.

3. To the extent Rodriguez seeks a procedural remedy for the revocation of his supervised release, the petition is **GRANTED**.

4. Respondents are **ORDERED** to provide Rodriguez with the informal interview required by 8 C.F.R. § 241.13(i)(3) by **April 3, 2026**. If that

procedure is not provided by the Court's deadline, Respondents are directed to release Rodriguez.

5. The Clerk is directed to enter judgment accordingly and close the case. The Court will retain jurisdiction to enforce this Order.

**ENTERED** in Fort Myers, Florida on March 17, 2026.

Kyle C. Dudek
United States District Judge